YOUNKER BROTHERS, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 8–2174–C–1.

United States District Court, S. D. Iowa, C. D.

Aug. 6, 1970.

James F. Swift, James F. Swift, Jr. and John V. Donnelly, Des Moines, Iowa, for plaintiff.

Allen L. Donielson, U. S. Atty. and Stephen J. Csontos, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM

STEPHENSON, Chief Judge.

Plaintiff, Younker Brothers, Inc. (taxpayer), brought this action for refund of federal income tax for the year ending January 31, 1963, in the amount of $343,886.09 [1] plus statutory interest thereon. Plaintiff contends said taxes were erroneously, illegally and improperly assessed and collected from it. Jurisdiction is founded upon the provisions of Title 28 U.S.C. § 1346(a) (1).

Plaintiff's claim for refund is based upon its claim that it should have been allowed a net operating loss carryover of $696,125.69 sustained by The Lawrence Corporation (formerly Daniels and Fishers Stores Company) which at the time of its liquidation on January 31, 1962 was primarily owned by plaintiff. (At the time of liquidation plaintiff owned 91.49% of the shares of stock of The Lawrence Corporation then outstanding.)

This cause was tried to the Court. Many of the facts were stipulated. Extensive briefs were filed by both parties.

ISSUES PRESENTED

1. Whether, within the meaning of Section 269 of the Internal Revenue Code of 1954 (26 U.S.C. § 269), the taxpayer "acquired control" of The Lawrence Corporation by redemption of stock of The Lawrence Corporation.

2. If taxpayer did acquire control within the meaning of Section 269, whether taxpayer did so for the principal purpose of evasion or avoidance of federal income tax by securing itself the benefit of the net operating loss of The Lawrence Corporation which benefit the taxpayer would not otherwise have enjoyed.

FINDINGS OF FACT

1. Plaintiff, Younker Brothers, Inc., is a Delaware corporation, has its principal place of business at Des Moines,

---

[1]. The parties have stipulated that if decision is rendered for the plaintiff, judgment shall be entered for this amount, together with statutory interest thereon.

Iowa and is in the business of operating department stores.

2. Plaintiff (and its predecessors) has operated a department store in Des Moines, Iowa since 1874, and added two additional Des Moines stores in 1959 and 1962, as well as stores located at Ames, Iowa since 1941, Bettendorf, Iowa since 1960, Burlington, Iowa since 1966, Cedar Rapids, Iowa since 1960, Fort Dodge, Iowa since 1947, Iowa City, Iowa since 1949, Newton, Iowa since 1960, Marshalltown, Iowa since 1948, Mason City, Iowa since 1944, Oskaloosa, Iowa since 1957, Ottumwa, Iowa since 1949, Sioux City, Iowa since 1947, Spencer, Iowa since 1960, and Austin, Minnesota since 1958. In addition, in 1961 plaintiff purchased all of the stock of Thomas Kilpatrick & Company, a Nebraska corporation, which operates three department stores in Omaha, Nebraska. One of the three stores now operated by Thomas Kilpatrick & Company was owned and operated by Plaintiff from 1955 to 1961.

3. The Daniels and Fisher Stores Company (D & F) was incorporated in the State of Colorado in 1901 and was in the business of operating department stores. As of 1954, D & F operated department stores in Denver and Colorado Springs, Colorado.

4. The taxable income of D & F for the fiscal year ended January 31, 1954 as adjusted by the Internal Revenue Service, but before deduction of a net operating loss carryback from the fiscal year ending January 31, 1956, was $185,500.89.

5. The White House Dry Goods Company of Beaumont, Texas (White House), a Texas corporation, is in the business of operating department stores. At all times here relevant White House was a wholly owned subsidiary of the Boston Store Dry Goods Company (Boston Store), an Arkansas corporation engaged in the operation of department stores. Mr. Jerome Ney, President of White House, was President of and controlled Boston Store.

6. Pursuant to an Agreement and a Voting Trust Agreement among Plaintiff, White House, and Boston Stores, the Plaintiff and White House each acquired 56,604 shares of D & F stock between May, 1954 and September, 1956. Plaintiff acquired no additional shares of D & F stock after September, 1956. The Voting Trust Agreement required agreement by both parties in voting their respective stock. As of May, 1954, D & F was authorized to issue 160,000 shares of stock and 160,000 shares of stock were issued and outstanding.

7. To finance the stock acquisition, plaintiff and White House entered into a note agreement with the New England Mutual Life Insurance Company (New England Mutual) and by that means secured $1,750,000. The note agreement provided that plaintiff and White House could not vote their stock in favor of a sale by Daniels and Fisher of its operating assets.

8. In late August of 1957, the directors of D & F approved a proposed sale of the assets of the Company because operations had been unprofitable. Prior to the shareholders' meeting of October 30, 1957, at which approval of the sale was given by the shareholders, plaintiff and White House secured the consent of New England Mutual to the sale of the assets on the condition that the unpaid principal balance of $1,330,000 be repaid no later than August 25, 1958. This amount was repaid on August 1, 1958.

9. On November 13, 1957, D & F entered into an agreement with May Department Stores Company for sale of the principal part of the corporation's assets, agreeing to sell all of its accounts receivable, inventory and fixtures as well as all leasehold improvements on the Colorado Springs property. The closing date was November 18, 1957. The sale of the operating assets of D & F to May Department Stores Company resulted in a loss of $301,578. At the same time D & F agreed to sell its real estate to Webb & Knapp, Inc., including its interest in a long term lease known as the Alkire lease. As a condition of its contract of

sale to the May Co., the name of D & F was changed to "The Lawrence Corporation."

10. During the fiscal year ending January 31, 1958, The Lawrence Corporation sustained a net operating loss of $933,745.09. After the sale of its operating assets in November, 1957, the principal activity of The Lawrence Corporation consisted of (1) investing the sums received from the sale; (2) completing the sale of the real estate to Webb and Knapp; (3) collecting delinquent accounts, settling law suits and other procedures to complete technical aspects of the sale and (4) looking for a store for The Lawrence Corporation to purchase. It had very few employees.

11. As of February 19, 1958, 165,000 shares of D & F (The Lawrence Corporation) stock were issued and outstanding and the largest shareholders of D & F were plaintiff and White House, each of whom owned 56,604 shares of stock, 34.305 percent of the outstanding stock.

12. The Board of Directors of The Lawrence Corporation, in a meeting on March 12, 1958, discussed the feasibility of a partial stock redemption with the cash funds held in the treasury of the company. Mr. Jerome Ney reported that various plans to accomplish this objective were being considered by the company's attorneys and special tax counsel. It developed that Mr. Ney was in need of funds to pay the note due New England Mutual and his other business interests. Subsequently, on May 14, 1958, Mr. Joseph Rosenfield, Chairman of the Board of Directors of plaintiff (taxpayer) and Mr. Ney, together with their respective counsel, had a meeting regarding this matter during which plaintiff agreed to vote in favor of redemption with the understanding that White House's redemption would be limited to approximately 45,000 shares so that Section 382 of the Internal Revenue Code [2] would not operate to extinguish the net operating loss of The Lawrence Corporation.

13. Thereafter the Directors of The Lawrence Corporation approved a stock redemption program made available to all stockholders. The redemption price for the stock was the net asset value per share as of July 1, 1958. It was indicated that plaintiff would not tender stock for redemption. The shareholders approved the redemption plan July 7, 1958. Subsequently, during the fiscal year ending January 31, 1959, 85,528 shares of The Lawrence Corporation stock were redeemed, including 45,205 shares owned by White House. None of the stock redeemed was owned by plaintiff, thus as of such date plaintiff owned 71.225% of the total outstanding stock. In the following years additional stock was redeemed to the extent that on January 31, 1962 when The Lawrence Corporation was liquidated plaintiff owned 91.494% of the stock outstanding (56,604 shares out of a total of 61,866 outstanding).

14. After the sale of the operating assets of D & F to the May Company, Mr. Morey Sostrin, President of plaintiff, during the years in question, investigated several department store properties for possible purchase by The Lawrence Corporation.

15. Funds The Lawrence Corporation received from its sale of assets as they became available were invested' in liquid assets for which income was received. Over the four years ended January 31, 1959, 1960, 1961 and 1962, The Lawrence Corporation deducted a total of $220,522.-48 of its loss carryover against its income in those years and those deductions were allowed by the Internal Revenue Service.

16. In summary, the Court finds that: (1) plaintiff, taxpayer, in May 1954, entered into an agreement establishing a joint enterprise (with White House) for the purchase of a substantial interest in the D & F Corporation, which was in the business of operating department stores; (2) this was in accordance with taxpayer's established business of operating department stores in several localities, and in expanding its operations; (3) in May, 1954, pursuant to the

2. 26 U.S.C. § 382.

joint enterprise agreement, plaintiff acquired a substantial interest in D & F (32.8% of the outstanding stock); (4) plaintiff and White House then commenced operating D & F under new management; (5) the operation of D & F was financially unsuccessful, losses resulted in 1956 and 1957; (6) the sale of D. & F was consummated in 1957; (7) at the time of the sale taxpayer owned 34.-305 percent (34.305%) of the shares of D & F then outstanding; (8) White House (Ney) requested plaintiff's vote for redemption in order that it secure needed funds with which to finance its own obligations, including its share of the debt due New England Mutual on the joint loan of plaintiff and White House (used in financing the purchase of D & F); (9) plaintiff, on May 14, 1958, agreed to the redemption upon the condition that White House limit the stock it tendered for redemption to an amount (45,200 shares) which would preserve, for The Lawrence Corporation its loss carryover; (10) plaintiff was aware that the loss carryover could inure to its own benefit; (11) plaintiff continued to look for a suitable department store business in which to invest funds of The Lawrence Corporation; (12) in the fiscal year ending January 31, 1962, The Lawrence Corporation purchased an additional 11,000 shares owned by White House; (13) The Lawrence Corporation was liquidated on January 31, 1962, at which time plaintiff owned 91.494 percent (%) of the outstanding stock; (14) plaintiff claimed a net loss carryover (from The Lawrence Corporation) of $696,125.69, which it claimed it was entitled to deduct with respect to its fiscal year ending January 31, 1963.

17. The principal purpose for plaintiff's agreement to the stock redemption of The Lawrence Corporation and the control acquired as a result thereof was not to evade or avoid federal income tax.

## CONCLUSIONS OF LAW

■■■■ 1. Plaintiff, taxpayer, acquired control of The Lawrence Corporation within the meaning of Section 269 of the Internal Revenue Code of 1954 by virtue of the redemption procedures initiated on May 14, 1958. It was then that it was agreed that White House stock in The Lawrence Corporation would be redeemed to the extent of 45,205 shares, and other shareholders could have their stock redeemed to the extent requested, whereas plaintiff, taxpayer would not turn its stock in for redemption. Acquisition of control may be direct or indirect. It may include the formation of a new corporation and the acquisition of its stock. James Realty Co. v. United States, 280 F.2d 394 (8th Cir. 1960); Bobsee Corp. v. United States, 411 F.2d 231; a consolidation of two corporations, F. C. Publication Liquidating Corp. v. Commissioner, 304 F.2d 779 (2d Cir. 1962). The increase in plaintiff's ownership from 34.305% to 71.225% and ultimately to 91.494% solely as a result of the stock redemption program constituted an acquisition of control within the meaning of the statute. The objective of Section 269 is to nullify tax avoidance schemes.

■■■■ 2. This being a refund suit the burden of proof was on the plaintiff, taxpayer, to establish that the principal purpose for which plaintiff agreed to the stock redemption was not to avoid or evade federal income tax. The plaintiff has met that burden. The stock redemption occurred as a result of the sale of the D & F business in 1958. The decision to sell was based on a business judgment to avoid further losses in the operation of the business. Plaintiff's associate in the joint enterprise needed funds to pay off the loan used in acquiring its stock and for other purposes. Plaintiff was under no duty to insist on liquidation. Having decided not to liquidate it was reasonable business prudence for the plaintiff to protect the loss carryover of The Lawrence Corporation that would likely be available to it upon purchase of another department store business. The fact that during the next three to four years The Lawrence Corporation failed to purchase another business does not alter the circumstances that

existed at the time the decision to redeem was made. See Hawaiian Trust Company Limited v. United States, 291 F.2d 761 (9th Cir. 1961). Plaintiff was aware of the possible tax consequences. However, it was under no duty to maximize federal income tax liability.

3. Plaintiff has established that it did not acquire control of The Lawrence Corporation for the principal purpose of evasion or avoidance of federal income tax by securing for itself the benefit of the net operating loss of said corporation which benefit the taxpayer would not otherwise have enjoyed.

Judgment will accordingly enter in favor of the plaintiff in the amount of $343,886.09 with statutory interest thereon.

Dated this 6th day of August, 1970.